**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF OREGON**
*(Portland Division)*

FILED 13 OCT '26 12:56 USDC-ORP

SCOTT C. MCCRACKEN,
*Plaintiff Pro Se,*

v.

TRI-COUNTY METROPOLITAN
TRANSPORTATION DISTRICT OF
OREGON (TRIMET),
*Defendant.*

**Case No.:** 3:26-cv-2237-YY
*(Employment Discrimination / Whistleblower Action)*

**COMPLAINT FOR EMPLOYMENT DISCRIMINATION AND RETALIATION DE NOVO PURSUANT TO THE NATIONAL TRANSIT SYSTEMS SECURITY ACT (6 U.S.C. § 1142) AND THE AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12101 ET SEQ.)**

**[DEMAND FOR JURY TRIAL]**

## I. INTRODUCTION & NATURE OF THE ACTION

1. Plaintiff Scott C. McCracken, a Senior Transit Operator proceeding *pro se*, brings this original action *de novo* against public transportation agency Tri-County Metropolitan Transportation District of Oregon (TriMet) pursuant to the National Transit Systems Security Act (NTSSA), 6 U.S.C. § 1142, the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and Oregon Safe Employment and Whistleblower statutes, including ORS 659A.199, ORS 659A.043, and ORS 654.010.

2. This action arises from a continuous, multi-year campaign of administrative harassment, targeted wage docking, bad-faith disciplinary fabrications, promotional blacklisting, and medical accommodation denials executed by TriMet executive leadership in direct response to Plaintiff persistently reporting public safety hazards, airborne toxic drug exposures, and the intentional deactivation of critical door-monitoring safety cameras across the transit fleet.

#118586

3. As a direct result of Plaintiff's safety advocacy, Defendant's management threatened him with termination, unlawfully withheld contractually guaranteed wages, manufactured pretextual disciplinary actions and suspensions, subjected him to public radio humiliation, and coerced him to operate an 80-ton light rail vehicle while medically incapacitated by Type 2 Diabetes, ultimately forcing a constructive demotion that disrupted his earning capacity and long-term retirement wealth. Plaintiff seeks full economic, compensatory, and punitive damages in the computed master amount of $3,017,250 to make him whole.

## II. JURISDICTION AND VENUE

4. This Court possesses absolute, original subject-matter jurisdiction over this action pursuant to the NTSSA "Kick-Out" framework, 6 U.S.C. § 1142(c)(7), which grants United States District Courts jurisdiction over original actions at law or equity for *de novo* review if the Secretary of Labor has not issued a final decision within 210 days of the initial administrative filing, provided the delay is not due to the employee's bad faith.

5. Plaintiff initially filed his whistleblower complaint with OSHA on October 5, 2024 (OSHA Case No. 301043281) and subsequently appealed to the Office of Administrative Law Judges on August 17, 2026 (OALJ Case No. 2026-NTS-00008). Significantly more than 210 days have elapsed without a final agency decision, and the administrative delay is a direct result of agency backlogs and formal Order Staying Proceedings issued by Chief ALJ Stephen R. Henley on September 1, 2026.

6. Subject-matter jurisdiction is further supported by 28 U.S.C. § 1331 (Federal Question Jurisdiction) and 6 U.S.C. § 1142(c)(6)(A), which explicitly empowers federal district courts to hear NTSSA employee protection claims without regard to the amount in controversy.

7. Venue is proper in the District of Oregon pursuant to 28 U.S.C. § 1391(b) because the Defendant public transit agency (TriMet) maintains its principal legal headquarters and corporate operations within this judicial district, and all underlying operational actions, targeted suspensions, safety camera rollbacks, and retaliatory incidents occurred entirely on transit lines within Multnomah and Washington Counties, Oregon.

8. Pursuant to the Supremacy Clause of the United States Constitution (Article VI, Clause 2), Plaintiff's federal statutory remedies under 6 U.S.C. § 1142 stand supreme over, and completely bypass, any sliding-scale liability caps, sovereign immunity exemptions, or procedural notification bars contained within the Oregon Tort Claims Act (OTCA), ORS 30.272.

**III. PARTIES**

9. Plaintiff Scott C. McCracken is a resident of Lake Oswego, Washington County, Oregon. Plaintiff was hired by Defendant TriMet as a Bus Operator on December 26, 2017, graduated to the Rail Division as a certified Light Rail Vehicle (LRV) Operator on July 4, 2019, and was forced back to bus operations on December 2, 2025 in a constructive demotion, bearing Badge #8709.

10. Defendant operates vehicles in a regional light rail and bus mass transit system within the Portland metropolitan area. Defendant is an employer directly bound by the safety mandates of the Federal Transit Administration (FTA) and the employee protection provisions of 6 U.S.C. § 1142.

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

11. On October 5, 2024, Plaintiff fully exhausted his initial administrative filing obligations by submitting a timely whistleblower complaint to the U.S. Department of Labor OSHA Whistleblower Protection Program.

12. On October 18, 2023, Plaintiff also dual-filed a formal Complaint of Unlawful Practice with the Oregon Bureau of Labor and Industries (BOLI Case No. STEMIW231019-11131) and the Equal Employment Opportunity Commission (EEOC Charge No. 38D-2024-00059), placing Defendant on clear administrative notice regarding safety reporting discrimination and failure to accommodate. Standard Right-to-Sue notices were subsequently issued by the agencies, fully certifying the complete exhaustion of those parallel administrative remedies.

## V. DEFENDANT'S ONGOING ADMINISTRATIVE OBSTRUCTION AND PROCEDURAL BAD FAITH

13. Following Plaintiff's lawful administrative appeal to the OALJ, the Chief Administrative Law Judge entered a formal Order Staying Proceedings on September 1, 2026, freezing all active litigation, discovery exchanges, and motion practice deadlines.

14. In willful defiance of that judicial order, and demonstrating an ongoing pattern of retaliatory animus against a *pro se* litigant, Defendant's internal Legal Services division—operating through an unannounced paralegal, Joanna Panza, and an attorney, Michael Shin, who have both failed to enter a formal Notice of Appearance of record as of 10/12/2026—executed an unauthorized electronic transmission of Initial Disclosures to Plaintiff via email on September 10, 2026, without obtaining written consent for electronic service in direct violation of 29 C.F.R. § 18.30 while also attempting to conceal witness locations in the same disclosure.

15. Defendant's attorneys remained entirely unannounced on the active docket, executing a deceptive trap designed to coerce a *pro se* party into a mutual stay breach.

16. Defendant was required in a prior request to supply the Plaintiff's personnel file pursuant to ORS 652.750 in a complaint of *per se* libel (SIP: 785710). That request, made on 8/18/2026, passed the 45-day statute required response on 10/2/2026 and has not been delivered in defiance of ORS 652.750 as of 10/10/2026.

17. Defendant's flagrant disregard for court-ordered stays and state law mirrors its systemic disregard for public transit safety codes and operator protection mandates, confirming a corporate culture that prioritizes administrative gamesmanship over federal and state law compliance.

## VI. STATEMENT OF FACTS

a. Background, Airborne Toxic Exposures, and History of Mainline Violence Hazards

18. Plaintiff began his career as a Bus Operator with Defendant TriMet on December 26, 2017, consistently maintaining a perfect operational safety record post probation and achieving the rank of Senior Operator in the Rail and Bus Divisions.

19. Throughout his employment, Plaintiff actively engaged in protected safety activities by filing mandatory internal Rail Event Reports documenting systemic security breakdowns, blocked vehicle aisles, rampant rider drug use, denial of documentation vectors (ACD reporting), and systemic engineered non-enforcement of basic transit rider safety codes.

20. On November 16, 2021 (ACD #1057989), Plaintiff objected to operating a revenue train with oversized baggage completely blocking a primary door and emergency egress aisle. In response, TriMet Field Supervisor #9520 overrode Plaintiff's safety concerns, ordered him to proceed into revenue service anyway, and falsely reported to Central Control that the hazard had been cleared. Plaintiff was forced to radio dispatch over an open line to correct the supervisor's false report, establishing a milestone in a multi-year pattern of management valuing timetable adherence over worker and passenger protection.

21. On November 24, 2021 (ACID #1058732), due to a complete lack of station security, Plaintiff was physically assaulted while on duty at the Hollywood Transit Center by an unidentified non-destination rider. The assailant explicitly indicated he launched the attack because he "...wanted to go to Clackamas County Jail." to secure food and shelter. Plaintiff sustained neck and left arm injuries while defending his operating position.

22. While operating Light Rail Vehicles through enclosed tunnel alignments such as the subterranean Robertson Tunnel at Washington Park Station, Plaintiff repeatedly experienced heavy, concentrated secondhand marijuana smoke filling his operating cab. OCC controllers explicitly informed Plaintiff on recorded lines that airborne marijuana drug hazards were no longer classified, logged, or acted upon as "noxious fumes" reports, negating institutional responsibility to relieve exposed operators.

23. On March 31, 2022 (ACID #1071069), while operating westbound at Goose Hollow station with his cab window open to clear secondhand drug smoke and listen for external hazards, an armed trespasser entered the right-of-way with an industrial Stillson pipe wrench with a tape-attached rock. The intruder systematically shattered train windows mid-train and struck this heavy club directly against Plaintiff's cab window and arm while Plaintiff was bracing the cab window and attempting to pull it closed (shattering the reinforced glass). Plaintiff executed an emergency radio broadcast to halt an oncoming adjacent train to prevent a mass-casualty track collision mid assault. TriMet Transit Police arrived within five minutes but completely failed to locate the suspect traveling on foot while towing two heavy suitcases, demonstrating an "optics-only" approach to security.

24. On April 14, 2022 (ACD #1072312; PP Bureau Case #22-15652), repeat offender David Bruce Campbell targeted Plaintiff by pulling an interior emergency door release lever on a rear rail car to manufacture a door fault. Pursuant to TriMet mandatory procedures, Plaintiff was forced to exit the operating cab to reset the external mechanism and was given permission to do so by controller/supervisors, at which point the assailant ambushed and physically assaulted him inside the vehicle compartment.

25. The April 14, 2022, line-of-duty assault directly inflicted a full-thickness supraspinatus rotator cuff tendon tear in Plaintiff's left shoulder, necessitating invasive surgical repair and a continuous 54-week workers' compensation medical leave, involving months of painful physical therapy. Following the assault, the State of Oregon prosecuted the attacker in the Circuit Court for Multnomah County (Case No. 22CR17878), resulting in a pled down misdemeanor criminal conviction on February 28, 2023, of Interfering with Public Transit. This imposed a 24-month bench probation condition and a strict Judicial No-Contact Order legally barring Mr. Campbell from entering TriMet property without fare or approaching Plaintiff.

26. On May 19, 2023, Multnomah County Deputy District Attorney Julian Samuels formally transmitted the certified No-Contact Order to Plaintiff, explicitly noting that Campbell was ordered to remain off all TriMet property without fare. Prior to this ambush, TriMet possessed actual written notice that the same individual had an active no-contact order involving Rail Supervisor Todd Oliver, proving the danger to Plaintiff was entirely foreseeable.

b. Retaliatory Seniority Degradation, Reinstatement Blockade, and Stalking Exposure

27. While Plaintiff was out recovering under an accepted workers' compensation claim, Rail Operations Manager Erroll Meadows executed an administrative termination clause against Plaintiff on April 26, 2023. While an operational continuity service deployment clause may permit administrative releases, Defendant had in bad faith structured this release to impose a long-term loss of Plaintiff's accrued rail seniority tiers, executing a targeted penalty in direct violation of protective state workers' compensation mandate principles.

28. Following this termination, TriMet and its administrator, CorVel, improperly reclassified Plaintiff's contractually accrued, mandatory lump-sum leave payout as current wage offsets, systematically reducing his weekly temporary total disability checks by an estimated $6,275, directly disrupting his medical subsistence during his physical recovery window.

29. Plaintiff formally exercised his statutory Right of Return under ORS 659A.043 on May 12, 2023. To punish Plaintiff for his persistent safety documentation, Manager Erroll Meadows executed an arbitrary "management review hold" that blocked Plaintiff from returning to the payroll for 59 days after plaintiff's Orthopedic Surgeon certified his full physical recovery and his Right of Return was transmitted to Meadows in writing. Resulting in severe financial distress, loss of pay and retirement benefits, and an unnecessary continuation of COBRA healthcare coverage.

30. Defendant formally reinstated Plaintiff as a Rail Operator on July 10, 2023. In reckless disregard for employee safety, TriMet management completely failed to disseminate the judicial protection order to field supervisors or its contract security force. Consequently, between September 4, 2023, and October 30, 2023, the convicted assailant was permitted to use the transit system as an unmonitored hunting ground, actively stalking Plaintiff and boarding his operating trains eleven separate times across active dockets (including ACD #1126208, #1132272, and #1132441).

c. The Camera Deactivation Crisis and the August 7, 2024, Good Faith Challenge Blowout

31. Throughout late 2023 and early 2024, Defendant TriMet routinely deployed light rail consists with defective, blank, or malfunctioning exterior monitoring cameras. In particular, Type 3 car coupling configurations suffered systemic electronic incompatibility, forcing operators to invent ad-hoc mechanical workarounds—such as wedging small cardboard fragments into physical rocker switches—to force a functional display to ensure passenger door-clearing safety visibility.

32. In early March of 2024, Plaintiff participated in a high-level executive meeting in the Elmonica garage bullpen with General Manager Sam Desue, Jr., then-Chief Operating Officer (COO) Bonnie Todd, then Rail Transportation Manager Casey Goldin, and then Assistant Elmonica Rail Manager Richard Wade. Plaintiff directly confronted executive leadership regarding the hazards caused by camera malfunctions and uninspected rolling stock coupling defects as well as a broad series of other safety issues. Plaintiff offered to provide a ride along to demonstrate the safety issues facing rail operators for any of the managers present who wished it. GM Sam Desue Jr. accepted - directing plaintiff to set it up with his assistant (Adriana Vidales-Hernandez), thus initiating a formal, direct executive email chain between Plaintiff, General Manager Desue, and administrative assistant Hernandez to schedule the run. Following this impromptu meeting a sweeping administrative purge occurred: COO Bonnie Todd departed, Rail Transportation Manager Casey Goldin left the agency, Assistant Manager Richard Wade and Garage Manager Erroll Meadows were both summarily terminated under administrative pretexts. Six months later, despite many attempts to schedule this ride along, it had not occurred. The plaintiff reported retaliatory events to the office of the GM (Via Hernandez) and received no further emails from that office. On 7/24/24 a managerial decision was made to disable door cameras on LRVs fleet-wide.

33. Rather than repairing the fleet defects, TriMet executive leadership chose to legally obscure their maintenance backlogs. On July 24, 2024, Defendant issued Trainline Bulletin #528, which documented that maintenance personnel had intentionally deactivated fully functional door-monitoring cameras and side-view displays across most of the rail fleet, forcing operators to run completely blind into revenue service and reversing 35 years of safe transit precedent. This occurred shortly after the dragging fatality at Beaverton transit center on 12/21/23 of Jonathan Ignatious Edwards III involving operator Aldo Viloria. Rather than improve or repair door cameras that could help to prevent similar incidents, Trimet chose to cease repairing, then deactivate these essential safety devices for budgetary reasons initiating a freefall of policy and rule changes designed to place all responsibility for future incidents on operators. Rather than maintain critical safety devices, that disabling just one day before on 7/23/24 could be a firing offense for an operator and a federal felony under 18 U.S.C. § 1992(a)(1) & (5), TriMet disabled useful and functional door monitoring cameras without any reasonable cause.

34. On August 7, 2024, just fourteen days after TriMet systematically blinded its fleet door cameras, Plaintiff encountered an unauthorized, minimally 74-pound dual-battery Lectric XPedition brand cargo e-bike additionally loaded with unanchored baggage, parked completely across a primary emergency egress door and priority disability aisle. While Defendant's written SOPs completely omit weight measurement as a cargo safety factor, transporting a 74+ lb. unbraked projectile on wheels mid-cabin blocking ADA seating, doors, and escape routes creates an extreme safety hazard under rapid horizontal braking vectors. Plaintiff invoked a formal Good Faith Safety Challenge under then SOP A004. West and Central Control supervisors and an on-site Rail Supervisor refused to enforce code or follow the Established Good Faith Procedure. Within two hours of the incident, Interim OCC Director Mary Hill issued a direct written ultimatum instructing Assistant Rail Manager Richard Wade to threaten Plaintiff with termination for "gross insubordination" should he report an e-bike cargo issue again. In a follow up email Hill told the operator that supervisor instructions to operate superseded his concerns of criminal negligence or any individual judgment as an operator.

35. Simultaneously, management forced an illegal pay deduction on Plaintiff under the fraudulent code "abandonment" that began the minute Control Supervisors pulled him out of the operating seat and ordered him to return to the yard under orders in uniform on a westbound train. On September 13, 2024, Plaintiff transmitted a formal written notice directly to General Manager Sam Desue's executive office, explicitly documenting that Hill was using unauthorized administrative fiats to bypass safety codes. This 74-minute wage docking was later proven to be a direct violation of contract agreements pursuant to a binding Step 2 Grievance Resolution Agreement.

36. NTSSA Statutory Provision: Pursuant to 6 U.S.C. § 1142(g), nothing in the public transportation employee protection section diminishes any rights, privileges, or remedies an employee holds under other federal or state laws, or under a collective bargaining agreement.

d. Systemic Ergonomic Injuries, Open-Air Restroom Shaming, and Diabetic Coercion

37. On March 20, 2025 (ACD #1194625), Plaintiff formally reported that legacy Type 1 train unit LRV 228A entered revenue service with a severely bound, stiff Master Controller Handle (MDH) throttle stick. In violation of basic Safety Management System (SMS) principles, TriMet refused to swap the vehicle, compelling Plaintiff to exert extreme physical force to manipulate the throttle over an 8-hour shift. This forced exertion caused an acute, severe aggravation of his surgically re-attached left shoulder tendon, resulting in joint inflammation and radiating nerve numbness.

38. Following a July 10, 2025 platform overshoot caused by an uninspected mechanical braking failure on a 35-year-old rail car, TriMet management actively withheld the train's diagnostic logs and issued Plaintiff a pretextual 3-day unpaid suspension under an aggressive Conditions for Continued Employment (CCE) mandate designed to fast-track his termination. To protect his employment and safety from un-reproducible mechanical defects, Plaintiff was compelled to execute a voluntary constructive demotion out of Rail Operations back to the Bus Transportation Division on December 2, 2025, surrendering his hard-earned rail seniority and pay tier, overtime opportunities, status as a shop steward, and position on the accident appeals review committee.

39. On August 19, 2025 (ACID #1214338), Plaintiff arrived at the PDX terminal 19 minutes late due to TriMet's own infrastructure power failures. Because TriMet provides no operator restroom facility at the PDX terminus, Plaintiff walked 5 minutes into the terminal baggage claim through a construction pedestrian path to utilize a subterranean restroom.

40. Aware that the subterranean concrete structure acted as a radio-blocking Faraday cage, Controller J. Hale waited until Plaintiff entered the restroom to repeatedly call him on the radio, subsequently broadcasting a punitive directive for Plaintiff to undergo an en-route mental and physical "fit check" over an open, unencrypted public radio channel for a manufactured "radio violation".

41. Two hours later, after Plaintiff had been on active duty for over four consecutive hours without anything more than five minutes of restroom use, he spoke with a Station Agent (Ray Park), then called Control from the Elmonica bullpen land line to try to arrange a relief when he fell back to a new LRV. Controller Russ Fortney said it was impossible to arrange. He called Control again from the Fairplex desk after performing the relief to request 15 minutes to stabilize his blood sugar as a documented Type 2 Diabetic, then Called the Station agent, then called the MOD. OCC Manager Matt Springer intervened by calling Rail Supervisor Abderrafie Lakhal on his work cell and instructing him to find the Plaintiff and hand his phone to the Plaintiff who at the time was on the Fairplex landline describing the situation to the MOD. Plaintiff disengaged from the MOD conversation to take the new call and was given a strict ultimatum by Springer: operate a multi-ton LRV immediately without food or glucose testing or face immediate consequences for "refusal to work". This coercion forced Plaintiff to mark off sick for public safety, which Assistant Manager Temujin Liu immediately penalized by issuing a Minor Level Rule Violation write-up for "Timetable Compliance".

e. Ongoing Bus Division Retaliation, Fraudulent Complaints, and the September 28, 2026 "ADA Checkmate" Tipping Event

42. Following his transfer to the Bus Division, Executive Director Mary Hill and management continued their campaign of hyper-scrutiny. On August 13, 2026, management conducted a disciplinary review under SIP #783967 regarding a third-party rider complaint falsely accusing Plaintiff of inflicting intentional physical harm. Even though TriMet's internal video audit and risk management files conclusively proved that zero physical contact occurred, and it is mechanically impossible to close the rear door on a passenger in that bus model management ignored the video clarification and issued a formal disciplinary write-up under vague customer service guidelines to artificially inflate Plaintiff's disciplinary record.

43. On September 28, 2026, while operating Bus #3208 eastbound on Route 76 (Block 7685; CAD Log #1262202), Plaintiff was placed in an acute administrative trap—an "ADA Checkmate"—at the Beaverton Transit Center. An intending passenger in a wheelchair presented to board towing an ad-hoc, makeshift cargo cart stacked with unsecured, bulky personal property that significantly exceeded the maximum dimensions mandated by TriMet Code and corporate policy BO-404-SOP.

44. Boarding the unanchored, code violating cart in the cabin created an immediate egress and projectile hazard under transit safety rules, while denying entry could have triggered an ADA discrimination dispute. At 19:03 PDT, Plaintiff initiated an "ADA Tied Up" Mobile Data Terminal (MDT) message to hold the run and request a formal supervisory safety assessment under relevant ADA and cargo SOPs.

45. Road Supervisor Hassan Hassan (Badge #9180) responded to the scene at 19:18 PDT. Directly beneath active on-board CCTV cameras and microphones, Plaintiff verbally cautioned Supervisor Hassan that the parties were engaged in active federal litigation over safety code compliance, urging him to enforce the TriMet Codes. Options being to separate the wheelchair from the cargo - then break the cargo down to compliant size, or call a medical transport for the couple.

46. Supervisor Hassan explicitly rejected code compliance, refused to deploy the agency's authorized ADA Secondary Pass-Up Protocol mandated by BO-406-SOP, declared "It's my decision," and personally executed a non-compliant securement—stretching tie-down straps across both the wheelchair and the unanchored cargo cart while forcing the occupant to face backward away from the direction of travel, in direct violation of securement safety standards BO-701-SOP.

47. Upon contacting Merlo Garage Dispatch at 19:22 PDT to log a formal Operator Safety Code Violation Report documenting the dangerous directive, Merlo Garage Dispatch actively suppressed the safety report. Dispatch flatly refused to accept or log Plaintiff's entry, reclassified the entire timeline exclusively as a routine "ADA Complaint," and advised that auto-generated ACD #1262202 eliminated the need for an operator disclosure.

48. Plaintiff's safety warnings were physically validated minutes later during offloading at the Tigard Transit Center. As the passenger was maneuvered off the vehicle by her companion the ad hoc cargo cart completely tipped over mid-transit, nearly flipping the attached wheelchair and occupant onto the concrete platform. Connecting follower Operator Crystall Montano (20821), who was held by dispatch to accept the transfer, admitted under questioning by Plaintiff that she had never received training on SOP A004 Good Faith Safety Challenge rights, accepting the hazardous setup onto her vehicle without review.

49. As of the date of this filing, Defendant continues to maintain a hostile work environment, systematically suppresses operator safety reporting at the dispatch level, and has failed to furnish Plaintiff with a copy of his personnel records despite a formal statutory request submitted on August 19, 2026, exceeding the 45-day mandate under ORS 652.750.

## VII. CAUSES OF ACTION

**COUNT I: Whistleblower Retaliation**
(National Transit Systems Security Act — 6 U.S.C. § 1142)

50. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 49 as though fully set forth herein.

51. The NTSSA, 6 U.S.C. § 1142(a) and (b), strictly prohibits a public transportation agency from discharging, disciplining, blacklisting, or otherwise discriminating against an employee regarding their compensation, terms, conditions, or privileges of employment because the employee engaged in protected safety reporting or invoked a good-faith safety challenge.

52. Plaintiff repeatedly engaged in protected activities under 6 U.S.C. § 1142 by filing formal Rail Event Reports documenting unmitigated mainline violence, reporting hazardous unaddressed equipment defects (LRV 228A), objecting to the systemic deactivation of passenger safety cameras (Trainline #528), and invoking formal Good Faith Safety Challenges under SOP A004 regarding unsecured cargo hazards blocking emergency egress paths.

53. Defendant possessed actual, top-level administrative knowledge of Plaintiff's protected safety disclosures.

54. Plaintiff's protected safety advocacy was a substantial and contributing factor in the adverse employment actions executed against him by Defendant. These adverse actions include but are not limited to: threatening Plaintiff with termination within two hours of a safety challenge; forcing an illegal wage reduction; subjecting him to public, open-air radio restroom shaming; manufacturing administrative leaves and suspensions; denying promotional opportunities; threatening investigations into protected medical leave; and forcing a constructive demotion out of Rail Operations.

55. Defendant's retaliatory conduct was willful, executed in bad faith, and carried out with reckless disregard for federal transit safety standards and statutory employee protections, causing Plaintiff severe economic harm, physical injury, and profound emotional distress.

**COUNT II: Disability Discrimination and Interference**
(Americans with Disabilities Act — 42 U.S.C. § 12101 *et seq.*)

56. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 55 as though fully set forth herein.

57. At all times relevant, Defendant possessed full corporate notice that Plaintiff suffered from documented, certified chronic medical conditions, including Type 2 Diabetes and Obstructive Sleep Apnea, which constitutes a physical impairment that substantially limits one or more major life activities.

58. On August 19, 2025, after over four hours of continuous transit operations, Plaintiff requested a brief 15-minute operational pause to check his blood glucose levels and consume food to stabilize a volatile diabetic medical condition.

59. Defendant actively discriminated against and harassed Plaintiff on the basis of his disability by denying his request for medical stabilization, broadcasting a punitive fitness-for-duty

order over open public radio channels, and delivering a direct administrative ultimatum threatening him with possible immediate termination for insubordination if he did not operate a multi-ton transit vehicle while medically incapacitated.

60. Defendant's intentional refusal to permit basic glucose tracking accommodations forced Plaintiff to withdraw from service to prevent a catastrophic mainline accident, which Defendant immediately penalized as a performance infraction, resulting in an unlawful hostile work environment and an eventual constructive demotion.

**COUNT III: Procedural Due Process & Evidence Spoliation**
(Federal Common Law & 49 C.F.R. Part 673)

61. Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 60 as though fully set forth herein.

62. Under federal transit regulations and Safety Management System (SMS) principles, Defendant has an absolute corporate obligation to track, investigate, and preserve safety logs, dynamic braking telemetry packs, and maintenance data following operator notifications of mechanical rolling stock failure.

63. Following Plaintiff's platform overshoot on July 10, 2025, caused by mechanical braking failures on mixed consist hardware, Defendant systematically executed active spoliation of evidence by refusing to pull the data packs for trailing car LRV 235 and completely withholding maintenance reports from Plaintiff to manufacture pretextual operator error.

64. Furthermore, on August 13, 2026, Defendant deliberately sustained formal disciplinary findings against Plaintiff under customer service guidelines after onboard CCTV footage conclusively disproved third-party criminal accusations, violating basic procedural due process and contractually established Just Cause standards by maintaining fraudulent, defamatory material within Plaintiff's official personnel files.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Scott C. McCracken respectfully requests that this Court enter judgment in his favor and against Defendant TriMet, awarding the following computed master relief:

A. Category I Economic Damages: An award of back pay, promotional wage differentials between the Operator tier and the denied Controller/Supervisor track, interest-bearing leave payouts, and pre-judgment compound interest in the amount of $193,250;

B. Category II Lost Retirement Assets: An award compensating for foregone tax-deferred 457(b) and 401(a) contributions and lost long-term S&P 500 compound investment growth through target retirement in the amount of $627,000;

C. Category III Front Pay & Retirement Contributions Adjustments: An award of front pay wage differentials through age 58 and the present-value restoration of retirement contributions baseline calculations in the amount of $307,000;

D. Category IV Compensatory Damages: An award of general compensatory damages for emotional distress, mental anguish, public humiliation, the physical degradation and re-injury of his left shoulder tendon, and lifetime somatic medical costs (including lifetime GLP-1/Ozempic metabolic therapy and a retiree health insurance bridge) in the amount of $1,592,000;

E. Category V Statutory Punitive Damages: An award of maximum statutory punitive damages under 6 U.S.C. § 1142(d)(3) for Defendant's gross, willful, and bad-faith suppression of safety hazard reporting in the amount of $250,000;

F. Litigation Expenses: An award of out-of-pocket document production expenses, filing fees, and *pro se* litigation time valuation in the amount of $48,000; and

G. Any such other or further relief as this Court deems just, equitable, and proper.

**IX. JURY DEMAND**

Plaintiff Scott C. McCracken hereby demands a trial by jury on all counts, claims, and issues so triable in this action.

Respectfully Submitted,

Scott C. McCracken, Plaintiff *Pro Se*
6884 Montauk Circle Lake Oswego, OR 97035
Email: scmandfriends@gmail.com
Phone: (503) 717-2730

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF OREGON (Portland Division)**

## X. SWORN CHRONOLOGICAL PERSONAL AFFIDAVIT OF PLAINTIFF SCOTT C. MCCRACKEN

I, Scott C. McCracken, declare and state under penalty of perjury as follows:

I am the Plaintiff in the above-captioned civil action under the National Transit Systems Security Act (NTSSA), 6 U.S.C. § 1142. I have personal knowledge of the facts set forth herein, and if called as a witness, I am fully competent to testify thereto.

## SECTION I: BACKGROUND & PROTECTED SAFETY REPORTING HISTORY

1. I was hired by Respondent TriMet as a Bus Operator on December 26, 2017, eventually qualifying and graduating to the Rail Division as a certified Light Rail Vehicle (LRV) Operator on Ju[y 4, 2019. Throughout my tenure, I consistently fulfilled my professional duties while actively reporting physical hazards, passenger safety code violations, and equipment defects to maintain public and workplace safety.
2. On November 16, 2021, I filed Rail Event Report ACID #1057989 regarding Cascades cargo obstructing passenger egress, establishing an early record of objecting to management's non-enforcement of safety codes.

3. On November 25, 2021, while operating eastbound at Hollywood Station, an impaired passenger standing directly behind my cab began screaming racial slurs. I opened the cab door and instructed the individual to leave the train. The individual initially started to walk away, then turned, charged at me, and grappled at my waist in a physical assault (ACD #1058732). Following the altercation, the assailant pointed to the train's "operator assault is a felony" sign and explicitly indicated he wanted to be taken to Clackamas County Jail (though the incident occurred in Multnomah County) to secure shelter and food. Police responded and removed the individual. I sustained neck and left arm injuries while defending my operating position.

4. Plaintiff possesses a unique educational background in medical biochemistry and has spent his entire career working in safety-sensitive environments, including laboratory medicine, food service, and heavy transit vehicle operations where procedural errors carry fatal consequences.

5. On November 16, 2021, I filed Rail Event Report ACD #1057989 regarding Cascades cargo obstructing passenger egress, establishing an early record of objecting to management's non-enforcement of safety codes.

6. In late 2021, while operating an active Red Line rail consist, I observed a passenger had remained completely covered in a blanket for over six hours, and also having urinated extensively across the upper deck. Upon arriving at the Portland International Airport (PDX) terminus, Port Police refused to execute a welfare check or remove the non-compliant individual. Upon reaching the Gateway Transit Center, a field Rail Supervisor explicitly refused my request to pull the passenger off or evaluate a potential medical emergency, stating to me that he refused to act because he "wanted to make it home to his family." Instead of enforcing the TriMet Code, the supervisor threw Vo Ban absorbent powder under the seat and ordered me to operate the bio-contaminated train with an unchecked medical/mental health crisis under threat of an insubordination write-up.
7. On November 25, 2021, while operating eastbound at Hollywood Station, an impaired passenger standing directly behind my cab began screaming racial slurs. I opened the cab door and instructed the individual to leave the train. The individual initially started to walk away, then turned, charged at me, and grappled at my waist in a physical assault (ACD #1058732). Following the altercation, the assailant pointed to the train's "operator assault is a felony" sign and explicitly indicated he wanted to be taken to Clackamas County Jail (though the incident occurred in Multnomah County) to secure shelter and food. Police responded and removed the individual. I sustained neck and left arm injuries while defending my operating position.
8. Despite my demonstrated technical competence, including clearing all cognitive testing benchmarks for agency advancement on five separate selection tracks, management systematically rejected my promotional applications across Rail Controller, Training Supervisor, Rail Supervisor, and Station Agent tracks.

## SECTION II: LINE-OF-DUTY ASSAULTS, CRIMINAL PROBATION & WORKERS' COMP LEAVE

9. In 2014, I survived a severe gas explosion, sustaining full-thickness third-degree burns across twenty-five percent (25%) of my body, necessitating a one-month confinement inside the Legacy Emanuel Burn Center. During emergency transport and subsequent surgical bandage debridement, administration of medical-grade IV and nasal fentanyl triggered violent, involuntary physical convulsions and an hour-long systemic neurological shock reaction, establishing a severe clinical hypersensitivity and physiological allergy to the drug.

10. On March 13, 2022 (ACID #1069293), and again on March 27, 2022 (ACID #1070636), when forced to inhale concentrated, combusted illicit fentanyl and methamphetamine smoke freebased by passengers aboard active transit consists, my documented medical hypersensitivity caused immediate hot flashes, severe physical shaking, acute hyperventilation, and elevated stress, completely incapacitating my ability to safely operate an 80-ton light rail vehicle and forcing platform interventions by field supervisors who deemed me medically unfit to continue revenue service.

11. On March 31, 2022, while operating westbound at Goose Hollow Station, an armed trespasser entered the active mainline Right-of-Way (ROW) with an industrial Stillson pipe wrench taped to a rock. The intruder systematically shattered train windows mid-train and struck a heavy club directly against my left arm through the open window as I actively attempted to pull it closed (ACID #1071069). I was forced to execute an urgent emergency radio transmission to Control to stop an oncoming adjacent train to prevent a mass-casualty collision. TriMet Transit Police arrived within five minutes but completely failed to locate the suspect traveling on foot while towing two heavy suitcases, demonstrating an "optics-only" approach to security.

12. On April 14, 2022, at Old Town Station WB, passenger David Bruce Campbell pulled an emergency door release lever to stage an ambush and physically assault me when I entered the train to reset the door mechanism (ACD #1072312).

13. Etiology of Injury: The April 14, 2022 assault by David Bruce Campbell directly caused a full supraspinatus tendon tear in my left shoulder. This severe physical trauma necessitated invasive shoulder surgery, eight (8) months of intensive physical therapy, and caused a severe, clinical aggravation of my pre-existing Complex Post-Traumatic Stress Disorder (cPTSD).

14. On February 28, 2023, in Multnomah County Circuit Court Case No. 22CR17878, David Bruce Campbell entered a guilty plea to four counts of Interfering with Public Transportation and was sentenced to 24 months of probation with a mandatory, court-issued No-Contact Order prohibiting him from contacting me or entering TriMet property without fare. On May 19, 2023, Multnomah County Deputy District Attorney Julian Samuels formally transmitted the certified No-Contact Order to me, confirming the legal mandate requiring the felon to stay completely off all TriMet property without paid fare and maintain absolute distance from me. This document was immediately shared with management. Mr. Campbell also had an active No-Contact Order involving Rail Supervisor Todd Oliver, proving TriMet was fully aware of his dangerous propensity.

15. The supraspinatus tear initiated an extensive Workers' Compensation claim spanning 54 weeks. I was recovering under temporary total disability, and while my attendance history was governed by corporate guidelines, Defendant's management executed a medical termination clause against me on April 26, 2023, while I was under active medical care.

16. Following this retaliatory termination, TriMet reclassified my contractually accrued, mandatory lump-sum leave payout as a current wage offset to systematically reduce my weekly CorVel temporary total disability checks by approximately $6,275. Furthermore, Manager Erroll Meadows executed a management review hold that stalled my active return to the payroll for months (until July 10, 2023) after I submitted a Right of Return notification on May 12, 2023. A delay of 59 days. My attending physician certified my full-duty recovery effective May 8, 2023.

**SECTION III: REINSTATEMENT BLOCKADE, STALKING REPORTS, TOXIC EXPOSURE & BOLI / EEOC DUAL-FILINGS (2023–2025)**

17. TriMet formally reinstated me as a Rail Operator on July 10, 2023. Upon my return, management subjected me to immediate psychological harassment by ordering me to report to Center Street Garage on two consecutive workdays under the pretext of completing routine paperwork, only to immediately subject me to separate Return-to-Duty and DOT CDL drug screenings both days (Passed).

18. Between September 4, 2023, and October 30, 2023, I filed multiple official Rail Event Reports (including ACID #1126208, #1132272, and #1132441) notifying Control and Manager Erroll Meadows that convicted probationer David Bruce Campbell was actively stalking me and boarding my operating trains in direct breach of his court order. TriMet management failed to issue an agency-wide security alert or take corrective action.

19. On October 18, 2023, I dual-filed a formal Complaint of Unlawful Practice with the Oregon Bureau of Labor and Industries (BOLI Case No. STEMIW231019-11131) and the EEOC (Charge No. 38D-2024-00059), placing TriMet on official administrative notice regarding whistleblower retaliation, safety reporting discrimination, and failure to accommodate. Standard Right-to-Sue notices were subsequently issued on September 19, 2024 (BOLI) and November 5, 2024 (EEOC), certifying no administrative finding on the merits.

20. During my tenure operating Light Rail Vehicles through the Robertson Tunnel at the Washington Park Westbound platform, I experienced an incident where heavy, concentrated secondhand marijuana smoke filled my operating cab. When I radioed Operations Control Center (OCC) to report the hazard and directly asked the controller, "Exactly how much weed smoke can I be exposed to and safely operate the train?", the controller explicitly informed me on a recorded line that cannabis smoke was no longer classified, logged, or processed as a "noxious fumes" report. This refusal to acknowledge airborne drug hazards in an enclosed, deep-underground tunnel environment forced me to remain at the controls of a multi-ton light rail vehicle while exposed to psychoactive contaminants, directly violating federal safety principles.

## SECTION IV: THE EXECUTIVE MEETING, CAMERA DISABLING BULLETIN, AND THE AUGUST 7, 2024 SAFETY CHALLENGE

21. In early March of 2024, I participated in a high-level executive meeting in the bullpen with General Manager Sam Desue, Jr., then-Chief Operating Officer (COO) Bonnie Todd, Rail then Transportation Manager Casey Goldin, and then Assistant Rail Manager Richard Wade. I directly confronted executive leadership regarding the Bureau-level hazards caused by chronic camera breakdowns, split-screen monitor failures, drug exposures, operator assaults, and systemic Type 3 consist re-coupling electronic mismatches that forced operators to jam rocker switches with pieces of cardboard to maintain door-clearing visibility.

22. At the conclusion of the meeting, I offered to take any manager present on an in-service ride-along to show them the real-world safety failures. To my surprise, General Manager Desue agreed to the ride-along on the spot. This agreement initiated an active, documented executive email chain between myself, General Manager Desue, and his assistant Hernandez to finalize a scheduling date. Immediately following this agreement, a sweeping administrative turnover occurred: COO Bonnie Todd departed, Rail Transportation Manager Casey Goldin has since left the agency, and Assistant Rail Manager Richard Wade was summarily terminated under administrative pretexts.

23. Rather than repairing the fleet-wide camera defects I raised, TriMet executive leadership chose to legally obscure their maintenance backlogs. On July 24, 2024, TriMet management published Trainline Bulletin #528, documenting the ordering of maintenance to intentionally deactivate external door monitoring cameras and side-view displays across the Type 1, 2, 3, and 5 rail fleets. Having just executed an unprecedented, top-down safety rollback that compromised passenger door-clearing visibility, executive leadership was in a state of acute administrative sensitivity to frontline safety reporting.

24. On August 7, 2024, just fourteen days after TriMet systematically blinded its fleet, I re-encountered a formerly aggressive and verbally abusive passenger with a 74-pound (unloaded) dual-battery Lectric XPedition brand cargo e-bike loaded with unanchored baggage that I had previously required him to remove from the vehicle as it violated several safety codes as well as for his attempts to intimidate and harass a vehicle operator. He parked the vehicle completely across a primary emergency egress door and priority disability seating bay. Recognizing that operating under these blinded, obstructed conditions constituted gross negligence, I invoked a formal Good Faith Safety Challenge under SOP A004 at Providence Park EB. Central Control supervisors refused to enforce code, and within two hours of the incident, Transportation Executive Director Mary Hill had issued a written ultimatum instructing Richard Wade to threaten me with termination for "gross insubordination" should I report an E-bike hazard again. Wade chose to give a physical print of her email instruction to him later that day at Pioneer Square EB.

25. Simultaneously, management forced an illegal pay deduction on me under the fraudulent code "abandonment" while I was in uniform returning to the yard under orders after the challenge. I was in uniform, on duty, following supervisor instructions during this period. I was met at the garage by Asst, Mgr. Richard Wade without any chance at union representation and told to accept the pay cut or be sent home. This 74-minute wage docking was later proven to be a direct violation of contract agreements pursuant to a binding Step 2 Grievance Resolution Agreement. On September 13, 2024, I transmitted a formal written notice directly to General Manager Sam Desue's executive office, explicitly documenting that Hill was using unauthorized administrative fiats to bypass safety codes and penalize vocal whistleblowers. LR/HR had claimed executive level managers could not retaliate because Trimet's anti-retaliation rule was a SOP and managers "at her level" had the right to alter SOP.

**SECTION V: MANUFACTURED DISCIPLINE, DIABETIC HARASSMENT & BUS DIVISION RETALIATION**

26. On March 20, 2025, I filed an Injury Report (ACID #1194625) documenting a repetitive strain injury caused by an unaddressed, stiff Master Controller Handle (MDH) on LRV 228A, representing an ongoing operational ergonomic defect across the light rail fleet.

27. Following a July 10, 2025 platform event involving a ~39-year-old Type 1 lead car coupled to Car 235, Railway Equipment Maintenance (REM) failed to perform required hardware diagnostics on Car 235's trainline flex-coupling. Despite this mechanical failure, Assistant Manager Temujin Liu issued me a 3-day unpaid suspension on August 14, 2025, alongside aggressive Conditions for Continued Employment (CCE) that placed me on a status where any subsequent rule violation within 18 months could result in immediate termination.

28. To protect my employment and safety from un-reproducible mechanical defects, I was forced to execute a voluntary constructive demotion out of Rail Operations back to the Bus Transportation Division on December 2, 2025, surrendering my hard-earned seniority and pay tier. Following my transfer, Mary Hill was promoted to Executive Director of Transportation, keeping my daily operations directly under her structural command.

29. On August 19, 2025, Controller J. Hale engaged in open-air radio restroom shaming while I was utilizing a public facility after a delayed line arrival (ACD #1214338). Immediately thereafter, OCC Manager Matt Springer issued an ultimatum over a supervisor's phone threatening a write-up for "refusal to work" when I requested 15 minutes to stabilize my blood sugar and eat as a documented Type 2 Diabetic. This coercion forced me to mark off sick for public safety, which Assistant Manager Temujin Liu immediately penalized by issuing a Minor Level Rule Violation write-up.

30. On November 17, 2025, I issued a formal written notice to Assistant Rail Manager Tim Liu logging top-down verbal threats regarding my protected FMLA/PLO leave usage, ongoing diabetic accommodation denials, and the forced constructive demotion away from Rail Operations.

31. On August 13, 2026, TriMet management conducted a disciplinary review under SIP #783967 regarding a third-party passenger complaint alleging rear-door contact. TriMet's internal video audit and mechanical logs conclusively proved that zero physical contact occurred. Despite absolute proof of passenger fraud and libel *per se*, management issued a formal disciplinary write-up against me under customer service guidelines to artificially inflate my disciplinary record.

32. On September 15, 2026, at Beaverton Transit Center, while operating Bus #3268 (Block 7685), an attending field supervisor completely ignored an active, hazardous E-Bike safety code violation occurring directly behind him (which I pointed out to him) in the Transit Center. Instead of enforcing agency safety code, the supervisor boarded my bus to subject me to hyper-scrutiny and questioning regarding a personal uniform exemption. When I subsequently called Merlo Garage Dispatch at approximately 20:15 PDT to log a formal report regarding this safety non-enforcement and targeted harassment, the dispatcher explicitly refused to generate or provide an ACD incident number, further demonstrating the agency's systemic suppression of safety and hostile workplace reporting.

33. On August 18, 2026, I submitted a formal written request for a complete copy of my personnel file pursuant to ORS 652.750. As of October 10, 2026, TriMet has failed to furnish my records, exceeding the 45-day statutory mandate.

## SECTION VI: THE SEPTEMBER 28, 2026 "ADA COMPLAINT" TIPPING INCIDENT

34. On September 28, 2026, while operating Bus #3208 eastbound on Route 76 (Block 7685) out of Merlo Garage, I was confronted with an acute operational trap—an "ADA Checkmate"—at Beaverton Transit Center (BTC).

35. At approximately 19:03 PDT, an intending passenger in a wheelchair presented to board with an ad-hoc, makeshift cargo cart stacked with unsecured, bulky personal property attached to the rear of her wheelchair. The attached cart significantly exceeded the maximum 18"x18"x30" container dimensions mandated by TriMet Code § 28.15(5)(a) and corporate policy BO-404-SOP, presenting an unanchored, heavy egress and projectile hazard. However, denying boarding would have created an immediate ADA dispute under Title II of the Americans with Disabilities Act.

36. At 19:03 PDT, I initiated an "ADA Tied Up" Mobile Data Terminal (MDT) dispatch message to hold the run and request supervisory assessment. I quick-tapped the bus horn to signal Road Supervisor Hassan Hassan (9180), who was present in his vehicle. Supervisor Hassan indicated he would "loop around" but departed the transit center instead; leaving the situation unresolved and forcing me to transmit repeated "ADA Tied Up" MDT messages as my run fell 15+ minutes behind schedule.

37. Supervisor Hassan returned at approximately 19:18 PDT. Standing directly beneath the active on-board CCTV cameras of Bus #3208, I verbally cautioned Supervisor Hassan that TriMet and I were engaged in active federal litigation over safety code compliance and oversized cargo enforcement, urging him to enforce TriMet safety code.

38. Supervisor Hassan explicitly rejected code enforcement, declared "it's my decision," and personally executed a non-compliant securement—stretching standard 4-point straps across both the wheelchair and the unanchored cargo cart while forcing the occupant to face backward away from the direction of travel, in direct violation of securement safety standards BO-701-SOP.

39. Upon calling Merlo Garage Dispatch at 19:22 PDT to log a formal Operator Safety Code Violation Report documenting that I was ordered by a field supervisor to operate with an unsafe configuration, Merlo Dispatch actively suppressed my safety report. Dispatch refused to log my safety report, reclassified the event exclusively as an "ADA Complaint," and advised that auto-generated ACD #1262202 eliminated the need for an operator safety disclosure.

40. En route to Tigard Transit Center (TTC), I again contacted Dispatch to coordinate transfer to the held connecting Route 76 follower bus operated by Crystall Montano (#20821), warning Dispatch that transferring the contraption would re-initiate the safety hazard on her vehicle.

41. While offloading the passenger at Tigard TC, the unanchored cargo cart tipped over mid-transit, nearly flipping the attached wheelchair and occupant, while the wheelchair was maneuvered off the flip-ramp with one wheel off the edge—conclusively validating my initial safety assessment that the contraption constituted an imminent hazard.

42. When I questioned connecting Operator Montano (20821) at Tigard TC, she admitted she had never received training on SOP A004 Good Faith Safety Challenge protocols and accepted the non-compliant setup onto her bus without re-initiating supervisory review.

43. The September 28, 2026 incident establishes that TriMet maintains an operational culture governed by contradictory policy traps, actively suppresses operator safety disclosures at the dispatch level, overrides safety codes under threat of discipline, and fails to train operational staff on federally protected whistleblower rights under 6 U.S.C. § 1142.

44. Defendant further intensified its campaign of targeted whistleblower retaliation by submitting a demonstrably fraudulent and factually manufactured position statement to initial OSHA Whistleblower Protection Program investigators (OSHA Case No. 301043281) in an attempt to legally conceal its adverse payroll docking and punitive operational penalties. Upon being formally confronted with Plaintiff's second comprehensive administrative rebuttal—which appended immutable electronic telemetry metadata, recorded communications, and corporate log registries that completely demolished the validity of Defendant's assertions—Defendant's Legal Services division willfully refused to correct, amend, or withdraw its fraudulent positioning. Defendant's intentional maintenance of a known falsehood before a federal regulatory oversight body constitutes a continuous, independent act of administrative retaliation designed to obstruct justice, mislead investigators, and inflict ongoing severe distress upon a *pro se* whistleblower.

**VERIFICATION MANDATE**
(Pursuant to 28 U.S.C. § 1746 — Unsworn Declarations Under Penalty of Perjury)

I declare under penalty of perjury under the laws of the United States of America that the foregoing initial pleading text, causes of action, prayer for relief, jury demand, and accompanying chronological personal affidavit are entirely true, correct, and factually accurate.

EXECUTED in Multnomah County, State of Oregon on this 13th Day of October, 2026.

Respectfully submitted,

Scott C. McCracken, Plaintiff *Pro Se*
6884 Montauk Circle
Lake Oswego, OR 97035
Email: scmandfriends@gmail.com
Phone: (503) 717-2730